IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN WILLIARD FULLER** | : | |
| | : | |
| v. | : | **CIVIL ACTION NO. 16-995** |
| | : | |
| **CHRISTOPHER NARKIN, ET AL.** | : | |

**McHUGH, J.**                                                                                                        **August 11, 2022**

# MEMORANDUM

This case arises out of action taken by a Norristown police officer at the conclusion of a dangerous high-speed chase. Plaintiff John Fuller contends that Defendant Christopher Narkin used excessive force when he shot him in the arm after Fuller failed to comply with police orders to surrender and continued to "rev" the tractor trailer he was driving in a continued effort to escape. Officer Narkin now moves for summary judgment on the remaining claims against him for excessive force and state law battery.[1] Because all the evidence of record supports the conclusion that Officer Narkin's conduct in discharging his weapon was objectively reasonable in light of the dangerous circumstances of the arrest, I will grant his motion for summary judgment and dismiss the remaining claims.

   I.   **Legal Standard**

This motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as described by *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

---

[1] The Complaint also made a conspiracy claim under 28 U.S.C. § 1983 against Narkin and two other officers, but I dismissed that claim as barred under *Heck v. Humphrey*, 512 U.S. 477 (1994). ECF 47, 48.

475 U.S. 574, 587 (1986). "The mere existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue." *Giles v. Kearney,* 571 F.3d 318, 322 (3d Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007)

Defendant's motion is unopposed because Plaintiff has not filed any response, but a plaintiff's failure to respond "is not alone a sufficient basis for the entry of a summary judgment." *Anchorage Assocs. v. V. I. Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990). Rather, the Court "still must find for itself that there is no genuine dispute of material fact and that the movant deserves judgment as a matter of law." *United States v. Brace*, 1 F.4th 137, 143 (3d Cir. 2021).

## II. Procedural History & Record

This case was originally filed over six years ago. Plaintiff began this action *pro se*, but, because it involved a shooting, I appointed counsel through the Eastern District's Prisoner Civil Rights Attorney Panel. Plaintiff was represented by capable attorneys from the Montgomery McCracken firm. I denied a motion to dismiss on the basis of qualified immunity, ECF 47, a ruling that was affirmed on appeal. ECF 54. But following the successful dismissal of the appeal, Fuller parted ways with his attorneys. ECF 57. After his counsel withdrew their appearance, I relisted his case on the Eastern District of Pennsylvania's Prisoner Civil Rights Panel. ECF 58. In response to multiple notices that his case was due to be delisted due to no interest from attorneys on the panel after four months, Plaintiff was able to timely respond to the Court by letter to ensure that his case remained listed. *See* ECF 59, 60, 61, 62, 63, 65, 66, 67. In each instance, I extended

the listing. In a letter to the Court sent on December 27, 2021, Plaintiff claimed to have never received the summary judgment filings from September 20, 2021, ECF 67, but took no further action. On March 2, 2022, I finally ordered the case removed from the volunteer attorney panel and granted Plaintiff seventy-five days to conduct any further discovery and to respond to the outstanding motion for summary judgment. ECF 68. Following the entry of this Order the Court received a letter from the Plaintiff, dated February 7, 2022, in which the Plaintiff again claimed to have never received the summary judgment filings. ECF 69. In response, Defendant's counsel docketed a letter to the Court, certifying that they had sent Plaintiff the summary judgment filings on September 20, 2021, and resent them in response to Plaintiff's December letter on January 17, 2022. ECF 70. To support that certification, Defendant's counsel attached emails documenting the prison's receipt and delivery of both the September and the January packages to Plaintiff. ECF 70 at 3-8. Four months later, Plaintiff has still not submitted a response to the summary judgment motion, for which the response date was May 17, 2022, nor has he responded to the Court's order of March 2, 2022, or defense counsel's letter filed on March 9, 2022. Given the length of time this case has been pending, the multiple attempts to secure counsel, and confirmation that Plaintiff has been served with the pending motion, I deem the motion ripe for consideration.[2]

The record consists of materials produced as part of Fuller's criminal proceedings culminating in a weeklong trial from March 7 through March 11, 2016, and first submitted to the

---

[2] Although Plaintiff is *pro se*, neither of the Third Circuit's noted exceptions to the equal treatment of *pro se* and represented litigants applies here. *See Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239 (3d Cir. 2013) ("Aside from the two exceptions discussed below, federal courts treat pro se litigants the same as any other litigant."). Those two exceptions are, first, being lenient in applying procedural rules "especially when interpreting their pleadings," *id.* at 698, and second, "when converting a motion to dismiss into a motion for summary judgment," *id.* at 699-700. Neither exception is applicable here, and the standard principles governing motions for summary judgment apply.

Court related to the motion to dismiss. At that stage, I was limited to considering the contents of the judicial record in order to "evaluat[e] the significance of the jury's verdict," ECF 47 at 3 (citing *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999)), for the sole purpose of determining whether Plaintiff's claims, if prevailing, "would necessarily imply the invalidity of his conviction or sentence." *Heck*, 512 U.S. at 486. Now, upon Defendant's motion for summary judgment, these materials may be properly considered by the Court for their factual contents in relation to the parties' claims and defenses. *Kauffman v. Moss*, 420 F.2d 1270, 1275 (3d Cir. 1970).

This record consists of testimony from law enforcement and eyewitnesses in the state criminal trial, as Plaintiff invoked his right to remain silent and did not present evidence.[3] Defendant submits in support of his motion the opinions of the state trial and appellate courts, Ex. D to Motion, ECF 64-2, his own testimony from the criminal trial, Ex. F to Motion, ECF 64-3, trial testimony of fellow Norristown police officer Chris Smith, Ex. G to Motion, ECF 64-4, trial testimony of fellow Norristown police officer (and prior defendant in this case) Corporal Detective Nicholas Dumas, Ex. H to Motion, ECF 64-4, trial testimony of (prior defendant in this case) Montgomery County Sheriff's Deputy Sean Forsythe, Ex. I to Motion, ECF 64-4, trial testimony of fact witness Luigi Boccella, Ex. J to Motion, ECF 64-5, trial testimony of forensic toxicologist Dr. Edward Barbieri, Ex. K to Motion, ECF 64-5, and the Montgomery County District Attorney's use of force review of the incident, Use of Force Report (Nov. 6, 2014), Ex. N to Motion, ECF 64-

---

[3] The state court record reflects that in August 2015 the trial judge granted Mr. Fuller's motion to proceed *pro se* and defend the case without counsel. He was, however, represented by an attorney during trial.

5.[4] The single item in the record that reflects Plaintiff's perspective as to the events is an unsworn investigation interview of Plaintiff taken by Montgomery County Detective Gregory Henry the day after the incident and read into evidence through Detective Henry's testimony. N.T. 116-121 (Mar. 9, 2016), ECF No. 30–7.

### III. Factual Background

At the criminal trial, Officer Narkin testified that Plaintiff Fuller was operating a tractor-trailer that spanned more than 50 feet in length, traveling at a high rate of speed in a 25-mph zone within the Borough of Norristown, striking parked vehicles in the process. The truck ran through two red traffic lights before making a sharp turn where the driver lost control and broke through a guard rail and onto Route 202. Narkin observed that the truck was partially stuck but was concerned that Plaintiff was trying to extricate the vehicle to continue driving.[5] Narkin and other officers approached with weapons drawn, repeatedly commanding him to surrender. N.T. 51-75 (March 8, 2016), ECF 30-6. Initially Narkin was approaching from the passenger's side, but after Fuller "put his hands up and surrender[ed]," Narkin started to walk in front of the truck in order to get over to the driver's side and apprehend Fuller. N.T. 75:7-76:12 (March 8, 2016), ECF 30-6. Narkin then recounted:

---

[4] The complete trial transcripts are in the record as attachments to ECF 30, as filed by Defendant's counsel and provided by the District Attorney's Office of Montgomery County. For the sake of convenience and consistency with my opinion on the motion to dismiss, I will maintain reference to the full trial transcripts at ECF 30 throughout this opinion.

I further note I have reviewed the transcripts of those witnesses not specifically filed with Defendant's present motion to ensure that they did not otherwise raise any genuine disputes of material fact.

[5] In his *pro se* Complaint, Plaintiff pleaded that the shooting was unjustified because his collision with the guard rail had severed a brake line rendering the vehicle inoperative. The Amended Complaint refers to such damage as having occurred, "causing the brakes to automatically engage and stop the truck." Am. Compl. ¶ 13, ECF No. 22. This was based upon post-accident inspection of the truck. Nothing in the record suggests that the officers would have known at the time that the truck had been rendered inoperable, and the evidence at trial was that the engine remained on and that the vehicle was bucking.

> A. I was -- as I walked in front, he put his left hand and his right hand back down. The left hand went back onto the top of the steering wheel right here. The right hand went down to the right, which I assumed was the gearshift, and then the truck the engine started again, and then it started -- it like accelerated again, and then it started -- it like accelerated again and it started trying to break the truck free from whatever it was that it was stuck on. And now I'm directly in front of this thing, staring at the front of this truck as he's starting to try and power off of it, and now I'm directly standing in front of this thing.
>
> Q. So when you say he put his hands down, what specifically did you see and hear the truck doing at that point?
>
> A. He put his hands back on the steering wheel, one on the shifter, and then he tried to accelerate the truck forward … directly into where I was unfortunately standing.
>
> Q. What did you do?
>
> A. I still had my pistol in my hand, and I really didn't have much of a choice. I fired my service pistol, and I fired three rounds into where the driver was.

N.T. 76:13-77:13 (Mar. 8, 2016), ECF 30-6.

Other officers who were present near the truck at the time of the shooting confirm this course of events. Corporal Detective Nicholas Dumas testified:

> A. I was trying to stay with the tractor-trailer's passenger's side, so I was kind of aligning myself with the passenger's side of the vehicle.
>
> Q. And why *did* you choose that position?
>
> A. I felt that it was the safest if this tractor-trailer was going to just come plowing at us, I'd be able to get out of the way.
>
> Q. And when you had taken the position on the passenger's side of the truck, what were you focused on?
>
> A. The driver.
>
> Q. And from your position, what could you see of the driver inside of the cab?
>
> A. I saw I guess the top part of the steering wheel, and then I saw the driver basically, I guess, from the shoulders up, maybe a little lower, armpits.
>
> Q. Were you seeing him through the windshield or through the passenger's side door?
>
> A. The windshield.

6

…

Q. What, if anything, did you do to try to get him to stop and gain compliance?

A. We were yelling the words "stop, shut the truck off, stop, shut the truck off."

Q. How many times do you think you said that?

Q. I wasn't counting, but maybe 20

…

Q. Tell us what you saw or heard after that with respect to the truck.

A. Well, the truck -- the truck was like – the driver's sitting there, and he was -- it seemed like he was trying to put the truck into gear, and there was a lot of like grinding and screeching sounds that seemed like the gears were fighting each other. And every time he was doing that, the truck was jumping and buckling. And there was also a lot of smoke being developed while he was doing this.

Q. Okay. Where were the driver's hands while the truck was moving?

A. You could tell he was shifting with his one hand, the right hand, by the way he was moving, and it was correlating with the sounds we were hearing. And then his other hand appeared; it was just on the steering [wheel].

…

Q. You said that -- well, you're using the word "buckling." But could you tell us a little bit more about how the truck was moving.

A. It seemed like -- I mean, at the time it seemed like it was slipping out of gear. I didn't know what was going on with the truck. It seemed like it would catch and then there would just be this like loud screech, and it would kind of move forward, but not like it would hop up or jump a little bit forward, and then it would like kind of die out.

…

Q. And what happened at that point when the three [officers] were in those positions?

A. I believe the truck buckled approximately three times or went through this process where it was -- he was attempting to get the truck in motion and then stopped and would attempt to get it in motion again, and then it stopped and he would attempt to get it in motion again.

Q. What happened after those three times that you were --

7

>A. Well, after the third time, Officer Narkin shot the driver.
>
>…
>
>Q. Were you ever able to see him do anything with his hands besides just leave them where they were like that?
>
>A. Yes.
>
>Q. What did you see?
>
>A. He put his hands up in the air.
>
>Q. At what point in this incident do you recall that happening?
>
>A. Every time the truck stopped trying to move forward or stop grinding.
>
>Q. So if you saw him put his hands up, did you also see him lower his hands?
>
>A. Yes.
>
>Q. At the point when the -- when Officer Narkin fired those shots, where specifically was he in relation to the truck?
>
>A. Attempting to put the truck into gear and move forward.

N.T. 178:16-184:24, (Mar. 8, 2016), ECF 30-6.

Deputy Sheriff Sean Forsythe testified that he arrived at the scene of the crash in response to radio calls. While he did not visually witness the truck at the moment the shots were fired, he was present immediately prior and witnessed the erratic movement of the truck and the danger it represented to the responding officers:

>A. … I then got out of my vehicle and started to move to my left. As I started to move to my left, I heard multiple screams or screaming of "turn the truck off, turn the truck off," and I could see at that point, after I was able to clear the vehicle that was in front of me so I could get a clear view, I could see a tractor-trailer with damaged -- front rear damage to the truck, and it was continuously -- almost like it was holding, like somebody like was holding the back to a point of it was like lurching, coming forward, coming forward, coming forward. Multiple people screaming "turn the truck off, turn the truck off, turn the truck off."
>
>…

Q. … And then when you were between the two cars, where was Officer Narkin positioned?

A. Officer Narkin was in front of the truck.

Q. Okay.

A. At this point. Again, both -- even at this point, with me being here and Officer Narkin in the front, the truck is still continuously bucking forward. Officer Narkin again was screaming multiple times, "turn the truck off, turn the truck off."

…

A. When I left the area in the middle between the two cars, my back was now turned to Officer Narkin, so I could not see Officer Narkin at this point, because I was retreating back to the other way. When I got to the middle part of the back of the police car, I heard three shots. Those three shots went off, and I was like, oh. I dropped, tried to get small. I didn't know if -- what happened at that point. All I heard was three shots. When I heard the three shots, I kept staying low. I tried to get to the side of this back of -- probably what you'd say is the driver's side rear of the police car to see if I could identify anything or anyone. At that point, I heard Officer Dumas, who was still over in this area, put a radio transmission out to county radio stating that shots were fired.

Q. The last time you were looking at the truck -- correct me if I'm wrong -- you turned around to exit toward the right of this photo; is that correct?

A. When I was in the middle?

Q. Yeah.

A. Yes. I would --

Q. Before the gunshots, I mean.

A. Yes, before the gunshots. Yes.

Q. At that time that you turned your back, was the truck still moving?

A. When I turned my back to move over to come back to my original position, yes. And the reason -- that's one of the reasons why I moved, because I felt that if I stayed in this area, because the truck was still bucking forward -- that is, if it would have caught, I would have been stuck in a position where I couldn't get out to protect myself from any injury.

9

Q. You've said it; I just want to double-check that we're on the same page. If that truck had gone straight forward from where you were standing there, would you have been in the path of the truck?

A. I would have, yes.

Q. Where Officer Narkin was, was he in the path of the truck?

A. Yes.

N.T. 153:6-160:17 (Mar. 9, 2016), ECF 30-7.

Officer Chris Smith similarly did not witness Mr. Fuller's conduct within the truck, but testified to the danger the truck posed to those present at the scene:

Q. What did you do when you first arrived?

A. I immediately got out; of my car, parked my car, and then ran to the front of the car and looked to see what Officer Narkin was doing, tried to assess the scene.

Q. And all the officers that were on scene, where was their attention?

A. All on the cab of that truck.

Q. And why was your attention on the cab of the truck?

A. Because at the time, the truck was lurching forward and sounded like there was gears that were grinding. And the commands that I had heard even before I got -- when I was getting out of the car was "stop, stop the truck."

Q. How loudly was that or quiet?

A. It was very loud.

Q. Do you recall who was saying that?

A. I know Officer Narkin was. I'm not sure if Corporal Dumas was, but I know Officer Narkin was yelling, because I was looking at him when he was talking.

Q. And you told us that the truck was lurching?

A. Correct.

Q. Can you describe a little bit further what you saw.

A. It was as if the driver of the truck had every intention on moving that vehicle forward, and the grinding of the gears, I didn't know -- I don't drive a truck myself,

10

so I'm not sure how you would do that, but it sounded like he was trying to put it into gear and had some kind of difficulty or malfunction that he couldn't do it. But the cab, the actual cab of the truck, kept bucking forward like this (indicating).

Q. When you say the cab was bucking forward, was the whole vehicle moving forward any appreciable distance? Or what was happening?

A. It looked like it was just lurching forward. I wasn't able to tell exactly how far it was going, but the individual was making every attempt to move that vehicle forward.

…

Q. At some point -- well, tell me what you saw Officer Narkin doing during this time frame.

A. Officer Narkin had his handgun out and was commanding him to stop, stop the truck, stop the truck, turn the truck off.

Q. When you say he had his handgun out, what was he doing?

A. He was pointing it at the cab of the truck.

Q. And where was he when he was doing that?

A. He was in front of the path of the truck.

Q. Where were you when you observed that?

A. I was to the left of Officer Narkin. When I originally got out, I was in front of my vehicle, looked over and saw him standing there with his handgun out. I then moved to the left to try go to get to the angle of the truck, the side of the truck, to see what was going on.

Q. … What was the truck doing while Officer Narkin was in front of it?

A. It was lurching, actively lurching forward and making every attempt, from what I believed, to proceed forward towards him.

Q. And what happened?

A. He fired three shots.

Q. After that, what happened with the truck?

A. The truck stopped moving.

N.T. 114:9-118:5 (Mar. 7, 2016), ECF 30-5.[6]

Defendants also submit the testimony of a civilian witness, Luigi Boccella, who, from his own car, saw the entrapped tractor trailer. He testified that when the cops arrived, he could hear them through a cracked-open car window loudly yell "stop" repeatedly at the tractor trailer. N.T. 93:20-94:9 (March 7, 2016), ECF 30-5. He then noted that "[t]he truck was still rocking. The cops got there. I heard – I want to say two gunshots, and then everything like quieted up." *Id.* 93:13-15.

And, finally, at trial, a forensic toxicologist testified that a blood test showed that Mr. Fuller had secondary products in his blood that indicated that he had recently taken a benzodiazepine-class drug and cocaine. N.T. 66:14-67:6 (Mar. 9, 2016), ECF 30-7.

Plaintiff did not testify, but his statement to the police was admitted into evidence. The statement recounts that the chase began when his efforts to turn the trailer around on Route 22 led him onto side streets, where he hit some cars. He then sped away, hitting more cars, after bystanders threatened to call police. Eventually, an officer (Officer Narkin) pulled up behind him, but Plaintiff continued on. He later ran into a dead end on another street, which led him to go through a metal guardrail. As he testified,

> I went through a metal guardrail and landed on another road. I kept trying to drive, but the truck wasn't going. An alarm sounded in the truck, so I knew I lost air pressure. I saw the police in front of me. They had their guns out. They were yelling something I couldn't hear. At that point I didn't care if they shot me. I was

---

[6] With respect to his view of Fuller within the truck, Officer Smith testified that he was positioned to the side of the truck and that when looking into the cab he was only able to see a "silhouette of him sitting there." When pressed, he only was able to say that "I just saw him in there. I didn't see him making necessarily any movements." N.T. 121:23-122:7 (Mar. 9, 2016), ECF 30-7. During cross-examination, he clarified that he was facing the passenger door, *id.* 141:11-12, which would explain why he was limited in his view of Fuller who was seated in the driver's seat of the cab.

> still trying to drive, but it wasn't going well, so I put my hands up. At some point some bullets came through the window.

N.T. 118:21-119:6 (Mar. 9, 2016).

## IV. Discussion

I previously addressed the legal standard for constitutional excessive force claims in *Brown v. Upper Darby Police Dep't*, No. CV 16-2255, 2020 WL 733108 (E.D. Pa. Feb. 13, 2020), *aff'd*, No. 20-1452, 2021 WL 2948833 (3d Cir. July 14, 2021). As I noted there, in excessive force cases, a court "determine[s] whether a constitutional violation has occurred using the Fourth Amendment's objective reasonableness test." *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The objective reasonableness inquiry requires balancing "the 'nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* (quoting *Graham*, 490 U.S. at 395). Under *Graham*, the reasonableness of an officer's actions is judged without regard to the officer's "underlying intent or motivation." *Graham*, 490 U.S. at 397. Rather, the officer's actions must be judged considering the "totality of the circumstances." *Id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). *Graham* articulates a set of nonexclusive factors to guide a court's inquiry that examine "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Moreover, the Supreme Court emphasized in *Graham* that the test must be applied from a real-world and real-time perspective:

> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396-97 (cleaned up).

The Supreme Court has considered the reasonableness of using deadly force against suspects involved in high-speed chases in several cases. In *Scott v. Harris*, 550 U.S. 372 (2007), it considered the reasonableness of a police officer who, during a high-speed chase, ran a fleeing suspect off the road by hitting the suspect's car with his own bumper. Applying *Graham*'s totality of the circumstances test, the Supreme Court recognized the "paramount governmental interest in ensuring public safety" and "the risk of bodily harm that [plaintiff's] actions posed to [the officer] in light of the threat to the public that [the officer] was trying to eliminate." *Id.* at 383. The Court then specifically noted that the plaintiff there "posed an actual and imminent threat to the lives of any pedestrians …, to other civilian motorists, and to the officers involved in the chase." *Id.* at 384. Alongside this, the Court considered the "relative culpability" of the parties. "It was [the plaintiff], after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that [the officer] confronted. … [T]hose who might have been harmed had [the officer] not taken the action he did were entirely innocent." *Id.* The Court concluded by finding that the officer's actions were plainly reasonable. *Id.*

At the motion to dismiss stage, I was obligated to accept facts pleaded as true. At summary judgment, an objective assessment of the evidence is required. Here, the uncontested record shows that Mr. Fuller had led police on a dangerous high-speed chase through populated areas putting pedestrians, other civilian motorists, and police officers at risk. And it shows that after Fuller was cornered—and despite loud and audible police calls to stop his vehicle and surrender—he continued to rev his engine and act to put the truck in gear, creating an imminent threat to the

14

police officers, such as Officer Narkin, near the vehicle. Had Fuller successfully evaded arrest, he would have again put more civilians and officers at significant risk of bodily harm.

The facts here are similar to *Plumhoff v. Rickard*, 572 U.S. 765 (2014), a case in which police officers had exited their own vehicles after cornering a suspect who had led them on a dangerous high-speed chase through traffic and then fired multiple shots into the vehicle as the suspect revved his engine, which the officers rightly interpreted as a continuing threat to run them over on the suspect's way to escape. *Id.* at 769-771. The Supreme Court held that the officer's decision to fire into the vehicle while it was stopped when the suspect continued to present an active threat to the officers and the public was objectively reasonable and did not constitute a constitutional violation. Similarly, in *Brosseau v. Haugen,* 543 U.S. 194 (2004), a case decided on sovereign immunity grounds, the Court reiterated the rule that "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.* at 203. Taken together, these cases make it clear that that the Supreme Court affords officers substantial latitude in using force to address the threat posed by fleeing vehicles.

Mr. Fuller's unsworn statement to the police, as read into the criminal trial record by Detective Gregory Henry, does not create a material issue of fact:

> I went through a metal guardrail and landed on another road. I kept trying to drive, but the truck wasn't going. An alarm sounded in the truck, so I knew I lost air pressure. I saw the police in front of me. They had their guns out. They were yelling something I couldn't hear. At that point I didn't care if they shot me. I was still trying to drive, but it wasn't going well, so I put my hands up. At some point some bullets came through the window.

N.T. 118:21-119:6 (Mar. 9, 2016). Even by Fuller's own description, Officer Narkin's response to the threat that Fuller had already posed, still posed, and was likely to pose in the future, was objectively reasonable. Specifically, he admits that he was "still trying to drive" after, and despite,

(1) seeing the police in front of him, (2) seeing their weapons drawn, and (3) hearing them yelling at him.  It was only after he found himself unable to drive through the cops to escape them that he claims he surrendered.  His statement is silent or ambiguous as to whether his foot remained on the accelerator even when he put his hands up, whether he put his hands back down after initially raising them, and when in the sequence of events the police fired at him.  Against this testimony, both Narkin and Dumas testified that the shots were fired only after seeing Fuller reach for the controls of the truck, at a time when the truck was bucking and revving, with the officers positioned in a way that they felt they were in imminent danger.  This testimony is supported by other eyewitnesses, including both civilians and officers, who testified at trial that the truck was still bucking and revving at the time at the shots were fired and that Officer Narkin was in front of the truck such that had the truck continued forward he would likely have been seriously injured.  As I noted in the Memorandum denying the motion to dismiss, given the overall testimony at trial, regardless of where Fuller's hands were at any particular point, so long as he appeared to be attempting to drive forward by any means, Officer Narkin would have been at risk.

      And events leading up to a use of force must also be considered.  The governing test "requires us to assess not only the reasonableness of [the officer's] actions at the precise moment of the shooting, but the 'totality of circumstances' leading up to the shooting." *Johnson v. City of Philadelphia*, 837 F.3d 343, 350 (3d Cir. 2016).  Here Fuller had led police on a highly dangerous motor vehicle chase using a tractor-trailer through an urban area with no regard for the safety of civilians or the police officers in pursuit.  He had acted erratically and continued acting erratically as he attempted to restart the vehicle and flee.  Given the imminent danger posed by Mr. Fuller to the police officers and the risk it would pose to civilians and the police were Fuller successful in

16

placing his truck in gear and escaping, combined with the split-second decision Officer Narkin was required to make, no reasonable jury could find that excessive force was used.

With respect to Plaintiff's state law battery claim, Pennsylvania similarly permits a police officer to "use reasonable force to prevent interference with the exercise of [their] authority or the performance of [their] duty." *Renk v. City of Philadelphia*, 641 A.2d 289, 293 (Pa. 1994). "The reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery." *Id.* Because I have found that Officer Narkin's use of force in arresting Fuller was reasonable under the Fourth Amendment, I likewise find that it was reasonable under Pennsylvania law and that Plaintiff's state law battery clam must therefore be dismissed.[7]

## V. Conclusion

For these reasons, I will grant Defendants' motion for summary judgment and dismiss the remaining claims. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge

---

[7] Having determined that Plaintiff's claims must be dismissed because Defendant's use of force was not unreasonable, I need not address Defendant's qualified immunity or municipal immunity arguments.